IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| JAMES DENNEY,[1] | ) Civil Action No. 3:10-1383-RMG-JRM |
| Plaintiff, | ) |
| vs. | ) |
| BERKELEY COUNTY; <br> WAYNE DEWITT, SHERIFF OF BERKELEY <br> COUNTY, IN HIS OFFICIAL CAPACITY AND <br> AS AN INDIVIDUAL; TINA MAYBANK; <br> JONATHAN MENZIE; CRYSTAL THOMPSON; <br> MARK TUCKER; AND <br> JONATHAN WIGFALL, EACH SUED <br> INDIVIDUALLY, | ) **REPORT AND RECOMMENDATION** |
| Defendants. | ) |

Plaintiff, James Denney, filed this action on May 27, 2010.[2] On January 18, 2011, Plaintiff filed an amended complaint ("AC") alleging claims under 42 U.S.C. §§ 1983, 1985, 1986, and 1988; the Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States; and South Carolina law. At the time of the alleged incidents, Plaintiff was a pretrial detainee at the Berkeley County Detention Center ("BCDC"). Defendants are Berkeley County; Berkeley County Sheriff Wayne DeWitt ("DeWitt"); and BCDC detention officers Tina Maybank ("Maybank"), Jonathan Menzie ("Menzie"), Crystal Thompson ("Thompson"), Mark Tucker ("Tucker"), and Jonathan Wigfall ("Wigfall"). On September 29, 2011, Defendants filed a motion for summary judgment.

---

[1] The spelling of Plaintiff's name is "Denny" in the caption of the original complaint, and "Denney" in the caption of the amended complaint.

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Civil Rule 73.02 (B)(2) DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the Court.

Plaintiff filed a memorandum in opposition on October 25, 2011, and Defendants filed a reply on November 14, 2011.

## STANDARD FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The moving party "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)) If the moving party carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson, 477 U.S. at 247-48). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFF

On September 29, 2008, the Charleston Port Police detained Plaintiff for an outstanding warrant issued in Berkeley County. Plaintiff's Dep. 46, 50. The warrant was for a lewd act upon a child under sixteen. Defendants' Ex. 1[3] (Affidavit) and 2 (Warrant); Plaintiff's Dep. 51. At

---

[3]Exhibits to Defendants' motion for summary judgment are designated as "Defendants' Ex. __"). Attachments to Plaintiff's memorandum in opposition to summary judgment are designated as "Plaintiff's Ex. __").

approximately 7:00 p.m., a bond hearing was held and a bond amount of $60,000 was set for Plaintiff. Plaintiff's Dep. 65.

BCDC operated on two twelve-hour shifts. The correctional officers involved in the alleged actions were working a shift that began at 5:30 p.m. on Monday, September 29, 2008, and ran until 5:30 a.m. on Tuesday, September 30, 2008. See Plaintiff's Ex. H (Daily Activity Report). The State of South Carolina sets minimum standards that require that persons incarcerated, or in pretrial status, be classified so their housing can be arranged to maximize safety and minimize potential for assault. See S.C. Code Ann. § 24-9-50(A)(2)(requiring reports on such classification); Plaintiff's Ex. D (excerpts of State Minimum Standards for Classification "for placement in housing."). The State requires that "assaultive/non-assaultive behavior," among other factors, be considered in determining detainee housing. Plaintiff's Ex. D (South Carolina Minimum Standards, § 1081), and requires "separate management" for persons in "categories that may pose a security problem" including persons charged with sex offenses. Plaintiff's Ex. D (South Carolina Minimum Standards, § 1082(a)).

Following his bond hearing, Plaintiff was given paperwork which specified his name, charge, and bond amount. Plaintiff's Dep. 68-69. Plaintiff was placed back in a holding cell, at which time he noticed another detainee was reading his (Plaintiff's) paperwork over Plaintiff's shoulder. Plaintiff's Dep. 78.

Defendant Maybank, who was present at Plaintiff's bond hearing, made the initial decision on the classification of Plaintiff and as to his placement. Maybank Dep. 20-21, 29 She states that the general population is mainly placed in Pod B, with violent offenders placed on the bottom part

of the pod and nonviolent offender on the top part of the pod. Overflow transfers to Pod C[4] when Pod B is full. Maybank 19. Maybank could not recollect her reasoning for placing Plaintiff in Pod C-1, but said that to put him there, would mean that every room was full to capacity on the top level of Pod B. Id. at 20-21. At around 10:00 p.m., Plaintiff was placed in Pod C-1 which housed at least 50 other detainees. See Answer, Para. 26; Plaintiff's Ex. C.

Another detainee (the one who allegedly read Plaintiff's paperwork) told other detainees that Plaintiff was a "child rapist." Plaintiff's Dep. 78. Plaintiff was aware of the onerousness of his charge which had the potential to elicit a strong adverse reaction from the other inmates. He lied to the other detainee about the charge, stating he was charged with unlawful possession of a firearm. Plaintiff's Dep. 218-219.

At approximately 10:05 p.m., Plaintiff returned from the restroom to find his towel, sheet, and pillow had been taken by other detainees. See Plaintiff's Ex. C. (Phone Call Transcript at 2). At around 10:15 p.m., Plaintiff called his parents from phones located in Pod C-1. Plaintiff's Dep. 81; Maybank Dep. 9. He told his parents he was "scared to death to go to sleep," and he thought "there will probably be a fight here before the night's over." Plaintiff's Ex. C (Phone Call Transcript at 3, 9).

After 11:00 p.m., bail bondsman Ernest Davis ("Davis") called the detention center and spoke with Sgt. Maybank. According to Maybank, "[Davis] said he'd been in contact w/[Plaintiff's] father and [Plaintiff's] father said that I/M Denney was being threatened." Plaintiff's Ex. K, Def. 035-036 (Maybank Statement). Maybank told Davis that nothing had been said to her and Plaintiff could call

---

[4]Plaintiff asserts that Pod C-1 is a general population cell that includes detainees with criminal records of violent crimes and assaults. AC, Para. 15. He lists a number of detainees housed with him who were charged with assault. See Plaintiff's Ex. I.

4

the tower by intercom if there was a problem. Id. Maybank did not go back to the cell to check on Plaintiff or determine whether he was being threatened. Maybank Dep. 53.

Breakfast is served at BCDC at approximately 4:00 a.m. The lights are dimmed or turned off after breakfast. See Plaintiff's Dep. 61. Defendant Menzie testified that the lights were turned off after breakfast to allow inmates to sleep. Menzie Dep. 15-16.

Some time before breakfast was served at its regular time, Robert Farrington (another BCDC detainee) began seeking other detainees to compose a "jury," for an apparent trial. Plaintiff's Dep. 100. Plaintiff was appointed another detainee as his "attorney," and detainee Christopher Wolf ("Wolf") agreed to serve as the presiding "judge." Plaintiff's Dep. 101-103. A jury was selected from detainees and Plaintiff was put on notice prior to breakfast that the other detainees were going to beat him up when the opportunity presented itself. Plaintiff's Dep. 104. Plaintiff testified that he "knew what was coming....They told me when the lights went out I would get beat." Plaintiff's Dep. 104.

Around 4:00 a.m., breakfast service began for Pod C, Plaintiff's housing unit. Plaintiff's Dep. 61; Defendants' Ex. C (Daily Activity Report for September 29, 2008). Plaintiff told other detainees that he did not want breakfast and did not need to get in line to get breakfast, but they told him to get in line and stand between them. Plaintiff complied. Plaintiff's Dep. 106-107. Breakfast was served to the inmates of Pod C by having the inmates form a line and exit through their housing unit door, passing by Defendant Tucker. See Tucker Dep. 15. Detainees filed to the far end of the room to get a food tray from Defendant Wigfall. Wigfall Dep. 44. Defendant Private First Class Wigfall was senior to Defendant Private Tucker. Wigfall Dep. 50. On their way back to the cell, inmates passed Tucker for a second time.

Plaintiff did not say anything to Tucker when he exited Pod C. Plaintiff's Dep. 107, Tucker Dep. 15. Upon reentering Pod C after getting his tray, Plaintiff told Tucker that he "couldn't go in there [the holding cell]." Tucker asked him why, and Plaintiff replied that he was "terrified for my life to go back in there because they're threatening to beat me when the lights go out." Plaintiff's Dep. 109. Plaintiff states that Tucker told him there was nothing he could do about it, but that Tucker would relay the message and get back with Plaintiff later. Plaintiff stated that "later's going to be too late." Plaintiff's Dep. 109-110.[5] Tucker conveyed to Wigfall that Plaintiff expressed feeling threatened. See Plaintiff's Ex. K, Def. 037; Tucker Dep. 36. Wigfall stated that he was informed by Tucker that an inmate in Pod C-1 overflow wanted to move out of the cell because there might be a problem. He told Tucker that he (Wigfall) would handle the situation after they were finished feeding the detainees. Plaintiff's Ex. K (Wigfall Witness Statement). Plaintiff claims that Wigfall directed Tucker to complete the lockdown of persons in Pod B and finish his (Tucker's) assignments as to medications, and that Wigfall would check on Plaintiff after that. See Plaintiff's Ex., Def. 038. Wigfall claims that when inmates have a problem in their cell they usually tell both officers in the dorm and refuse to go back to their cells, but Plaintiff did not do so. Plaintiff's Ex. K (Wigfall Statement).

Plaintiff claims that detainees covered the camera and intercom in Pod C-1 with wet toilet paper. Plaintiff's Dep. 118-119. Once the breakfast trays were collected, the detainees convened Plaintiff's "trial" with a judge, jury, and defense counsel. Plaintiff's Dep. 114. Plaintiff was found "guilty" and sentenced to a "brutal beating." Plaintiff's Dep. 119-120 Plaintiff claims that

---

[5]Tucker disputes Plaintiff's version of the facts and claims that Plaintiff merely told him (Tucker) that he (Plaintiff) was scared. Tucker Dep. 12.

6

approximately twenty minutes passed between Plaintiff speaking with Tucker and the record of the attack at approximately 4:50 a.m (see Plaintiff's Ex. K at Def. 569 (Wigfall Statement); Plaintiff's Ex. H, Def. 668 (Daily Activity Report)).

At approximately 4:50 a.m., Tucker, who was in the observation tower, heard an elevated noise level over the intercom system from Pod C and responded to investigate. Tucker Dep. 22. He radioed Wigfall and said he needed assistance. Tucker Dep. 25; Wigfall Dep. 89. Tucker and Wigfall removed Plaintiff from Pod C and put him in an interview room in the front of the detention center. Photographs were taken, Plaintiff was dressed out, and Plaintiff met with an investigator. Plaintiff's Dep. 131-132, Tucker Dep. 27; Wigfall Dep. 83.

Plaintiff was bonded out of the BCDC a few hours later, at around 8:00 a.m. on the morning of September 30, 2008. Plaintiff's Dep. 142. He asserts that he permanently lost all hearing in his right ear as a result of the beating. Plaintiff's Dep. 206-207. Wigfall noted that Plaintiff had some bruises on his face and some blood coming from his nose. Plaintiff's Ex. K, Def. 051 (Wigfall Statement).

In October 2008, nineteen detainees were charged with attacking Plaintiff. Plaintiff' Ex. K, Def. 033 (Supplementary Report). Plaintiff asserts that none of his alleged nineteen assailants were convicted of assaulting him.

During the course of interviewing detainees about the incident involving Plaintiff, BCDC employees discovered that three other beatings allegedly occurred shortly before Plaintiff's beating. On Wednesday, September 24, 2008, detainee Christopher Wolf ("Wolf") was allegedly beaten by five persons detained in Pod C-1 "after the lights went out." Plaintiff's Ex. K, Def. 055. Each of the five detainees who allegedly assaulted detainee Wolf also allegedly beat Plaintiff on September 30,

7

2008. On Friday, September 26, 2008, detainee Demario McGuire was allegedly beaten in Pod C-1 by five other persons. Of the five assailants identified, all were allegedly involved in beating Plaintiff on September 30. Plaintiff's Ex. K, Def. 0204-0206. On Saturday September 27, 2008, detainee Wolf was allegedly beaten again in Pod C-1by the same five Pod C-1 detainees who allegedly beat him on September 24, 2008. See Plaintiff's Ex. K, Def. 214.

## **DISCUSSION**

Plaintiff appears to allege claims against (1) Berkeley County, DeWitt, Maybank, Tucker, and Wigfall for deprivation rights; (2) the individual Defendants for a conspiracy in violation of 42 U.S.C. § 1985 ("§ 1985"); (3) Defendant Berkeley County for a violation of S.C. Code Ann. § 16-5-60; and (4) the individual Defendants for violations of the South Carolina Tort Claims Act ("SCTCA"), S.C. Code Ann. § 15-78-10, et seq. Defendants contend that they are entitled to summary judgment because: (1) Defendants DeWitt, Maybank, Menzie, Thompson, Tucker, and Wigfall are entitled to qualified immunity in their individual capacities; (2) Plaintiff fails to establish a deprivation sufficiently serious or that the prison official's state of mind was one of deliberate indifference such that Plaintiff has no cause of action for failure to protect; (3) Defendant DeWitt is entitled to Eleventh Amendment immunity in his official capacity; (4) Defendant Berkeley County should be dismissed because Plaintiff fails to establish that his injuries were caused by municipal policy or custom such that he fails to establish municipal liability; (5) Plaintiff is not entitled to any injunctive relief; and (6) there is no proof of any alleged conspiracy.

I.  Defendant Thompson

Plaintiff admits that the "facts as developed in discovery omit [Thompson] from decision-making or supervision as to Mr. Denney." Plaintiff's Opp. Mem. at 22. He also states, as

8

to the conspiracy claims, that he is "now content to voluntarily dismiss [Defendant Thompson] in light of discovery[.]" Plaintiff's Opp. Mem. at 26. Thus, it is recommended that Defendant Thompson be dismissed as a party to this action.[6]

   II.   Federal Claims

Plaintiff appears to allege, pursuant to 42 U.S.C. § 1983 ("§ 1983") that Defendants deprived him of his constitutional rights by failing to protect him from harm from other detainees. He also appears to allege conspiracy claims pursuant to § 1985.

   A.   § 1983 Deprivation of Rights - Failure to Protect

Plaintiff alleges that Defendants violated his constitutional rights (Fifth and Fourteenth Amendments). In their motion for summary judgment, Defendants contend that Plaintiff fails to establish a deprivation that is sufficiently serious or that the prison official's state of mind was one of deliberate indifference such that he has no cause of action for failure to protect. In his opposition memorandum, Plaintiff appears to argue that this action should be analyzed under the framework for an excessive force case. Review of the record, however, indicates that Plaintiff's claims should be analyzed as a failure to protect claim (rather than an excessive force claim)[7] as Plaintiff was allegedly

---

[6]In their reply memorandum, Defendants argue for the first time that Officer Menzie should be dismissed because he played no active role in the alleged events as he was stationed in the control tower and had no contact with Plaintiff. Reply at 4. Replies are discouraged, but are allowable if a party desires to reply to matters raised initially in response to a motion or accompanying supporting documents. Local Civil Rule 7.07 DSC. There is no indication that Defendants' argument regarding Menzie is in response to a matter raised initially in Plaintiff's opposition memorandum or supporting materials. Plaintiff brought allegations in his Amended Complaint that Defendants failed to protect him because they took no action to find out why the audio and visual means of monitoring the Pod was obstructed during the approximately twenty minutes of his trial and beating.

[7]Plaintiff appears to argue that Defendants' actions constituted excessive force because he was subjected to the beating by other detainees due to improper classification decisions and a lack
(continued...)

9

injured by Defendants failing to protect him from harm from other detainees, not that Defendants themselves used force against Plaintiff.

Allegations of deprivations of pretrial detainees are considered under the due process clause of the Fourteenth Amendment instead of the cruel and unusual punishment clause of the Eighth Amendment. Cooper v. Dyke, 814 F.2d 941 (4th Cir. 1987). The rationale for this distinction was explained in Ingraham v. Wright, 430 U.S. 651 (1977) at 671-72:

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions...the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with the due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

(citations omitted). However, the due process rights of detainees are at least coextensive with Eighth Amendment rights of convicted prisoners, and perhaps greater. Whisenant v. Yuam, 739 F.2d 160 (4th Cir. 1984); Loe v. Armistead, 582 F.2d 1291, 1292 (4th Cir. 1978), cert. denied, Moffit v. Loe, 446 U.S. 928 (1980).

---

[7](...continued)
of competent supervision by Defendants. Excessive force claims raised by a pretrial detainee are governed by the Due Process Clause of the Fourteenth Amendment. Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008). To succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment, Plaintiff must show that Defendants "inflicted unnecessary and wanton pain and suffering." Taylor v. McDuffie, 155 F.3d 479, 483 (4th Cir.1998)(citing Whitley v. Albers, 475 U.S. 312, 320(1991)). "In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973). Plaintiff's claims fail to rise to this level.

To establish a claim under the Eighth Amendment,[8] a prisoner must show that the deprivation is "sufficiently serious" and that prison officials had a "sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S. 294, 297-298 (1991). Deliberate or callous indifference on the part of prison officials to a specific known risk of harm states an Eighth Amendment claim. Pressly v. Hutto, 816 F.2d 977, 979 (4th Cir. 1987). Not every injury suffered by one inmate at the hands of other inmates, however, translates into constitutional liability for the prison officials responsible for the victim's safety. See Farmer v. Brennan, 511 U.S. at 835. In Farmer, the Supreme Court defined deliberate indifference, holding that "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 847. The test is not whether an official knew or should have known of the possibility of harm, but whether he did, in fact, know of it and consciously disregard that risk. "[T]he official must be both aware of

---

[8] Because both the Fourteenth Amendment's Due Process Clause and the Eighth Amendment address the permissibility of punishment, decisions addressing the dimensions of the Eighth Amendment's prohibition of cruel and unusual punishment provides guidance for analysis under the Due Process Clause in several respects. First, as noted above, the due process rights of a pretrial detainee are "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). Second, cases decided under the Eighth Amendment have addressed the meaning of the term "punishment" which forms the core of the protection afforded by both the Eighth and Fourteenth Amendments. See, e.g., Farmer v. Brennan, 511 U.S. 825 (1994); Martin v. Gentile, 849 F.2d 863, 871 (4th Cir. 1988) (inquiry as to whether officials are deliberately indifferent to serious medical needs is the same under the Due Process Clause of the Fourteenth Amendment and the cruel and unusual punishments of the Eighth Amendment). Third, in defining conduct that gives rise to liability under § 1983, the evolving standard has been "deliberate indifference." See, e.g., Redman v. County of San Diego, 942 F.2d 1435, 1441, 1443 (9th Cir. 1991)("The requirement of conduct that amounts to 'deliberate indifference' provides an appropriate balance of the pretrial detainees' right not to be punished with the deference given to prison officials to manage the prisons"), cert. denied, 502 U.S. 1074 (1992). Thus, it appears that a plaintiff's Fourteenth Amendment claim should examined under the deliberate indifference standard as set out in the Eighth Amendment claim cases discussed below. See, e.g., Ervin v. Magnum, 127 F.3d 1099, 1997 WL 664606 (4th Cir. 1997)[Table].

11

facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. While the objective information known to the official may be used to infer the knowledge he actually had, and to draw inferences about his actual state of mind, those inferences are not conclusive. Further, the Eighth Amendment is not violated by the negligent failure to protect inmates from violence. Whitley v. Albers, 475 U.S. 312, 319 (1986); Moore v. Winebrenner, 927 F.2d 1312 (4th Cir. 1991), cert. denied, 502 U.S. 828 (1991); Pressly, supra.

Although Defendants assert that Plaintiff did not establish a sufficiently serious deprivation, they provide nothing to dispute that Plaintiff suffered a serious or significant physical (or emotional) injury. See De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003). Maybank and Wigfall both wrote in their witness statements that they saw bruising on Plaintiff's face and blood dripping from his nose. See Plaintiff's Ex. K, Def. 037 and 051. Plaintiff asserts he lost hearing in one ear as a result of the attack. Thus, in the light most favorable to Plaintiff for purposes of summary judgment, Plaintiff has shown a serious physical injury.

Defendants argue that Plaintiff fails to establish that their state of mind was one of deliberate indifference. They argue that correctional officers were not aware of an "excessive risk" to Plaintiff because Plaintiff did not communicate or identify the risk or what he was "scared" about. Specifically, Defendants argue they did not know that Plaintiff faced a substantial risk of serious harm because Tucker states that Plaintiff only told him he was scared. See Tucker Dep. 12. For purposes of summary judgment, however, the facts must be taken in the light most favorable to Plaintiff. As noted above, Plaintiff testified he told Tucker that he was terrified for his life to go back in the cell because "they're threatening to beat me when the lights go out" and that checking on him later would be too late. Plaintiff's Dep. 109-110. Thus, he appears to have identified a risk

from which the inference could be drawn that a substantial risk of serious harm existed. In the light most favorable to Plaintiff, Defendant Tucker appears to have drawn an inference of harm to Plaintiff as he passed the information on to Tucker to determine what to do about Plaintiff's comment to him. Additionally, Plaintiff asserted that Defendants failed to protect him because Plaintiff's bond bailsman (Davis) relayed the concerns for Plaintiff's safety to Defendant Maybank, but she did not do anything about it; Defendant Maybank put him in a general population cell with inmates that had histories of violent crimes despite the nature of Plaintiff's charge; and correctional officers failed to notice during the fifteen minute trial and subsequent beating that the Pod C-1 cameras had been covered in wet paper towels.[9]

B.  Injunctive Relief

Defendants contend that Plaintiff is not entitled to injunctive relief. As Plaintiff has been released from detention at BCDC, his claims for injunctive relief are moot. See Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009) ("[A] a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there.")(citing Incumaa v. Ozmint, 507 F.3d 281, 286–87 (4th Cir. 2007)); Taylor v. Rogers, 781 F.2d 1047, 1048 n. 1 (4th Cir.1986)); Williams v. Griffin, 952 F.2d 820, 823 (4th Cir.1991)(Plaintiff's transfer mooted his § 1983 claims for declaratory and injunctive relief).[10]

---

[9]In their motion for summary judgment, Defendants only argue that Plaintiff failed to show deliberate indifference because what Tucker claims Plaintiff said to him (merely that Plaintiff was scared) was insufficient to put officers on notice that Plaintiff was at substantial risk for injury.

[10]Plaintiff admits in his opposition memorandum (at 25) that Berkeley County is sued for injunctive relief only as to this claim. Thus, Defendants' motion for summary judgment should be granted to Berkeley County as to Plaintiff's First Cause of Action.

C. Conspiracy

Plaintiff alleges that the individual Defendants violated his rights under 42 U.S.C. § 1985(3). Defendants contend that this claim fails because Plaintiff has not presented evidence that could reasonably lead to the inference that Defendants positively or tacitly came to a mutual understanding to accomplish a common and unlawful plan. They argue that there is a "complete absence of any proof of the alleged conspiracy." Defendants' Motion for Summary Judgment at 19. In his opposition memorandum, Plaintiff argues he has established a conspiracy claim because he has shown that Defendants DeWitt, Maybank, Menzie, Tucker, and Wigfall placed him in Pod C-1 for the purpose of exposing him to persons with known histories of assault so that Plaintiff would be assaulted as part of an "informal method among correction officers and inmates of retaliation and punishment" to deprive him of his rights to bail and Due Process.

Section 1985(3) provides to those injured by a conspiracy to deprive them of the equal protection of the laws a right of action against the conspirators. It reads in relevant part:

> If two or more persons in any State or Territory conspire ... for the purposes of depriving ... any person or class of persons of the equal protection of the law, or of equal privileges and immunities under the laws ... the party so injured may have an action for the recovery of damages ... against one or more of the conspirators.

42 U.S.C. § 1985(3). There is a heightened pleading standard for § 1985(3) conspiracy claims. Simmons v. Poe, 47 F.3d 1370, 1377 (4th Cir. 1995). The elements of this claim are: (1) a conspiracy of two or more persons; (2) who were motivated by a specific class-based, invidiously discriminatory animus; (3) to deprive the plaintiff of the equal enjoyment of rights of secured by the law to all; (4) and which results in injury to the plaintiff; (5) as a consequence of an overt act committed by the defendants in connection with the conspiracy. Buschi v. Kirven, 775 F.2d 1240, 1257 (4th Cir. 1985). In Griffin v. Breckenridge, 403 U.S. 88, 102-103 (1971), the Supreme Court

held that § 1985(3) includes conspiracies of private individuals. However, the Court limited this holding to require a plaintiff to show that an actionable private conspiracy must be motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Byrd v. Hopson, 265 F.Supp.2d 594, 603 (W.D.N.C. 2003), aff'd., 108 F. App'x 749 (4th Cir. 2004)(quoting Griffin v. Breckenridge). Moreover, the plaintiff "must show an agreement or a meeting of the minds by [the] defendants to violate the [plaintiff's] constitutional rights."

Plaintiff fails to allege or show any class-based, invidiously discriminatory animus behind Defendants' action. Further, he has not identified any specific evidence of an agreement by the individual Defendants to violate his civil rights. See Simmons v. Poe, 47 F.3d at 1377 (The Fourth Circuit has "specifically rejected section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts."). Thus, Plaintiff fails to establish claims under § 1985(3).[11]

### D. Eleventh Amendment Immunity (Defendant DeWitt)

Defendant DeWitt contends that he is entitled to Eleventh Amendment immunity in his official capacity. Plaintiff argues that DeWitt is not entitled to Eleventh Amendment immunity because he has only alleged federal claims against DeWitt in his individual capacity.

---

[11]At the beginning of his Amended Complaint, Plaintiff states that his claims are brought pursuant to § 1986. However, he does not make any specific claims under this statute. Section 1986 extends liability to those with knowledge of the conspiracy: "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in the preceding section ... shall be liable to the party injured ... for all damages[.]" 42 U.S.C. § 1986. Viability of a § 1986 claim is based on the antecedent § 1985 claim. If the 1985 claim is dismissed, the § 1986 claim also fails. Buschi v. Kirven 775 F.2d at 1243; Trerice v. Summons, 755 F.2d 1081, 1085 (4th Cir. 1985). Here, Plaintiff fails to establish a § 1985 conspiracy claim, such that Defendants' motion for summary judgment should be granted as to any claim under § 1986.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes," but the court found that state agencies, divisions, departments, and officials are entitled to the Eleventh Amendment immunity. Id. at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself and, therefore, against the state. State officials may only be sued in their individual capacities.

In Gulledge v. Smart, 691 F. Supp. 947 (D.S.C. 1988), aff'd mem., 878 F.2d 379 (4th Cir. 1989)[Table], the court addressed whether South Carolina sheriffs were state or county officials. The court applied South Carolina common law principles of the master and servant relationship and concluded that sheriffs are state officials. Id. at 954-955. The Fourth Circuit concluded, in Cromer v. Brown, 88 F.3d 1315 (4th Cir. 1996), that the Greenville County sheriff, in his capacity as a state official, was immune from suit for monetary damages under § 1983. Id. at 1332. Further, in Gulledge, the district court concluded that deputy sheriffs are agents of the sheriff and therefore under state, not county, control. Gulledge, 691 F. Supp. 955; see also Heath v. Aiken County, 368 S.E.2d 904 (S.C. 1988). In Cone v. Nettles, 417 S.E.2d 523 (S.C. 1992), the Supreme Court of South Carolina cited Gulledge with approval and specifically held that South Carolina sheriffs and their deputies are state officials for § 1983 purposes. Defendant DeWitt is a South Carolina sheriff. Thus, to the extent that Plaintiff has brought any federal claims against Defendant DeWitt, DeWitt is entitled to Eleventh Amendment immunity from monetary damage in his official capacity.

  E. Qualified Immunity (Individual Defendants)

Defendants Maybank, Menzie, Thompson, Tucker, and Wigfall contend that they are entitled to qualified immunity in their individual capacities. They argue that they did not violate any

16

of Plaintiff's clearly established constitutional rights because the beating was done by other detainees, Defendants did not facilitate or assist in the beating, the extent of the warning given by Plaintiff is contested, and the actions taken by Defendants were "clearly discretionary judgment calls." Defendants' Motion for Summary Judgment at 10. Plaintiff argues that Defendants are not entitled to qualified immunity because "plain incompetence of each of the Defendants is amply displayed, and cannot form the basis of qualified immunity." Plaintiff's Opp. Mem. at 22.

Government officials performing discretionary functions are entitled to qualified immunity from liability for civil damages to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The analysis of the defense of qualified immunity is generally examined using a two-step analysis. See Saucier v. Katz, 533 U.S. 194, 201 (2001).[12] The first step is to determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendant's conduct violated a constitutional right. Id. at 201. If the facts, so viewed, do not establish a violation of a constitutional right, the plaintiff cannot prevail, and "there is no necessity for further inquiries concerning qualified immunity." Id. If, however, a favorable view of the facts does establish such a violation, the next step is to determine whether the right violated was clearly established at the time of the alleged offense. Id. If the right was not clearly established, the defendants are entitled to qualified immunity. Id.

---

[12]The Supreme Court has clarified that these steps do not need to be taken in the sequence set forth in Saucier, and that
> [t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand.

Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Defendants do not appear to dispute that Plaintiff's rights were clearly established at the time of the alleged actions. They contend that they are entitled to qualified immunity because the facts alleged do not show that Defendants violated any of Plaintiff's constitutional rights. As discussed above, however, there is a genuine issue of material fact as to whether the individual Defendants failed to protect Plaintiff from harm from other detainees.

III. State Law Claims

Plaintiff alleges claims under South Carolina law against Berkeley County pursuant to S.C. Code Ann. § 16-5-60, and against the individual Defendants pursuant to the SCTCA.

A. § 16-6-50

Plaintiff alleges that Defendant Berkeley County violated § 16-5-60 because it has a policy or practice to provide insufficient funds for the Berkeley County Sheriff to enable the jail to be staffed, supervised, protected, and controlled; it hindered, prevented, or obstructed Plaintiff's due process rights to be free of cruel, corporal, and unusual punishments and be entitled to bail before any adjudication; and Plaintiff was injured as a result of his attempt to exercise his due process rights and right to bail. AC, Paras. 101, 103-105. Berkeley County argues that it should be granted summary judgment because Plaintiff fails to establish that his injuries were caused by municipal policy or custom. It argues that it cannot be accountable for the action of sheriff's employees, as the sheriff is a constitutional officer who hires, supervises, and terminates his own deputies and workers. Berkeley County also argues that Plaintiff cannot bring a cause of action against it under § 16-5-60 because this statute has been repealed by implication by the enactment of the SCTCA. In his opposition memorandum, Plaintiff appears to argue that his claim under § 16-6-50 is not predicated on a tort, such that this cause of action is not precluded by the SCTCA.

18

Section 16-5-60 of the South Carolina Code provides for a private cause of action against counties for damages resulting from civil rights violations. State v. Alls, 500 S.E.2d 781, 782 (S.C. 1998). Section 16-5-60 was enacted to protect the political rights and liberties of the citizens of the state. Brazzill v. Lancaster County, 128 S.E. 728, 729 (S.C. 1925).

Plaintiff fails to show that Berkeley County violated his civil rights. Berkeley County cannot be held accountable for the actions of Sheriff Dewitt or his employees. See Allen v. Fidelity and Deposit Co., 515 F. Supp. 1185, 1189–91 (D.S.C.1981) (County cannot be held liable for actions of deputy sheriff because deputy sheriffs serve at pleasure of the Sheriff, not the County), aff'd, 694 F.2d 716 (4th Cir.1982). "[T]he sheriff and the county are distinct and separate entities in South Carolina." Patel v. McIntyre, 667 F.Supp. 1131, 1146 n. 26 (D.S.C.1987). In Grayson v. Peed, 195 F.3d 692 (4th Cir.1999), the Fourth Circuit Court of Appeals determined that, where the Sheriff is charged with running the jail, the County, nor the County Council, had any control over the administration of the jail and, therefore, could not be liable under Section 1983 for alleged incidents that occurred at the jail. The court specifically held that, "[a]s the county has no control over policy within the jail, it bears no concomitant responsibility." Grayson, 195 F.3d at 697–698.

In his opposition memorandum, Plaintiff argues that Berkeley County should be held liable pursuant to § 16-5-60 because it failed to prevent group assaults known to occur at the BCDC. Plaintiff, however, fails to show how Berkeley County is liable for the assault.

B. SCTCA

Defendants have not specifically addressed Plaintiff's claims under the SCTCA, but appear to argue that these claims should be remanded to the state court for further proceedings because the causes of action under § 1983 should be dismissed. As it is recommended that the

19

motion for summary judgment be denied as to Plaintiff's First Cause of Action as to Defendants DeWitt, Maybank, Menzie, Tucker, and Wigfall, it is recommended that summary judgment be denied as to Plaintiff's SCTCA claim.

## CONCLUSION

Based on review of the record, it is recommended that Defendant Thompson be dismissed as a party to this action. It is recommended that Defendants' motion for summary judgment (Doc. 34) be granted, in part, as to Defendant Berkeley County (Plaintiff's First and Third Causes of Action), Plaintiff's Second Cause of Action, and Plaintiff's claims for injunctive relief, and denied as to Plaintiff's First and Fourth Causes of Action against Defendants DeWitt, Maybank, Menzie, Tucker, and Wigfall.

Joseph R. McCrorey
United States Magistrate Judge

July 17, 2012
Columbia, South Carolina