# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| James Denney,<br>    Plaintiff, | Civil Action No. 3:10-1383-RMG-JRM |
| v. | ORDER |
| Berkeley County;<br>Wayne DeWitt, Sheriff of Berkeley<br>County, in his Official Capacity<br>and as an Individual; Tina Maybank;<br>Jonathan Menzie; Crystal Thompson;<br>Mark Tucker; and Jonathan Wigfall,<br>Each sued Individually<br>    Defendants. | |

This case was automatically referred to the United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(c)and (e), D.S.C. Defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56. (Dkt. No. 34). Following briefing on that dispositive motion, the Magistrate Judge entered a Report and Recommendation (R&R) for review by this Court, recommending that: (1) Defendant Thompson be dismissed as a party to this action; (2) Defendants' motion for summary judgment be granted, in part, as to Defendant Berkeley County, Plaintiff's Second Cause of Action for a conspiracy in violation of 42 U.S.C. § 1985, and Plaintiff's claims for injunctive relief; and (3) summary judgment be denied as to Plaintiff's First and Fourth Causes of Action against individual Defendants DeWitt, Maybank, Menzie, Tucker and Wigfall. (Dkt. No. 62). The Defendants timely filed objections to the R&R, (Dkt. No. 63), and Plaintiff Denney responded and offered his own objections, (Dkt. No. 64).

Neither party submitted an objection to the Magistrate Judge's recommendations: (1) to

dismiss Defendants Thompson and Berkeley County from this action; (2) to deny Plaintiff's request for injunctive relief; (3) to grant summary judgment for the Defendants as to Plaintiff's conspiracy claim under 42 U.S.C. § 1985; and (4) to preclude suit for monetary damages against Sheriff DeWitt, in his official capacity, under the Eleventh Amendment. Having reviewed the record in this matter, the R&R, and the applicable case law, the Court adopts those recommendations as the Order of the Court. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005); *Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).

**Legal Standard**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. *Mathews v. Weber*, 423 U.S. 261, 270–271, 96 S. Ct. 549, 554, 46 L.Ed.2d 483 (1976). The Court is required to make a *de novo* determination of those portions of the R&R to which specific objection has been made, and may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). This Court may also "receive further evidence or recommit the matter to the magistrate with instructions." *Id.*

The Defendants moved to dismiss Plaintiff's claims pursuant to a motion for summary judgment. Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In other words, summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).

In undertaking this task, the Court is mindful that it is not appropriate "to weigh the

evidence, to count how many affidavits favor the plaintiff and how many oppose him, or to disregard stories that seem hard to believe. Those tasks are for the jury . . . ." *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) (citation omitted). Instead, the Court will "construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hops. v. Am. Nat. Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996).

Where the Defendants raise qualified immunity at the summary judgment stage, the Court must determine whether the Plaintiff has raised a genuine issue of material fact about the Defendants' entitlement to qualified immunity. The doctrine of qualified immunity is based on the proposition that governmental officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of what a reasonable person would have known" at the time the action was taken. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L.E.2d 296 (1982). Thus, the doctrine has been construed to "provide[] ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.E.2d 271 (1986).

In resolving a qualified immunity defense, the Court must (1) determine whether the facts alleged, taken in the light most favorable to the Plaintiff, show that the Defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct, addressing these two requirements in the sequence it deems "will best facilitate the fair and efficient disposition" of the case. *See Pearson v. Callahan*, 555 U.S. 223, 231–32, 242, 129 S. Ct. 808, 815–16, 821, 172 L.E.2d 565 (2009).

With respect to the first requirement, the legal violation must have been apparent given

the information possessed by the officer acting under the circumstances he faced. *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992); *see also Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L.E.2d 523 (1987). In other words, "officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

In regard to the second requirement, that the legal right be clearly established, "the proper focus is not upon the right at its most general or abstract level but at the level of its application to the specific conduct being challenged." *Pritchett*, 973 F.2d at 312. Therefore,

> [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. at 640, 107 S. Ct. at 3039 (citation omitted). Notably, this standard allows for the fact that some dangers are so evident that it would have been apparent that certain conduct would deprive another of his constitutional rights, even though there is no case holding that precise proposition. *See United States v. Lanier*, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227, 137 L.E.2d 432 (1997); *Waterman v. Batton*, 393 F.3d 471, 476 (4th Cir. 2005) ("Although the exact conduct at issue need not have been held unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest.").

Whether Denney has shown a constitutional violation "boil[s] down to one relevant question: whether the individual defendants violated [his] Fourteenth Amendment rights as a pre-trial detainee through their deliberate indifference to a substantial risk of physical harm" faced by

-4-

Denney while in their custody. *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 302 & n.11 (4th Cir. 2004) (opinion of Williams, Circuit Judge); *see also Hill v. Nicodemus*, 979 F.2d 987, 990–92 (4th Cir. 1992) (holding that, for a deliberate indifference claim, a pretrial detainee's due process rights are co-extensive with a convicted prisoner's Eighth Amendment rights). A deliberate indifference claim requires a plaintiff to show an objective element (serious harm) and a subjective element (the defendant's culpable state of mind). This a high bar in a context where "[o]nly governmental conduct that shocks the conscience is actionable." *Young v. City of Mt. Ranier*, 238 F.3d 567, 574 (4th Cir. 2001) (quotations marks omitted).

The standard for showing the objective harm is that the deprivation alleged must be "objectively, sufficiently serious." *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006). To meet this standard when bringing "a claim based on a failure to prevent harm, a person must show that he [wa]s being detained or incarcerated under conditions posing a substantial risk of serious harm." *Brown v. Harris*, 240 F.3d 383, 389 (4th Cir. 2001) (quotation marks and citation omitted); *see also Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (stating, in the Eighth Amendment context, that "only extreme deprivations are adequate to satisfy th[is] objective component").

In addition to the objective harm, the plaintiff must show a subjective element: that the defendant possessed a sufficiently culpable state of mind. A plaintiff does this by proving two things: "that the defendants actually knew of <u>and</u> [that they] disregarded a substantial risk of serious injury" to the detainee. *Young*, 238 F.3d at 575–76 (emphasis added); *see also Short*, 436 F.3d at 427 ("[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with

-5-

knowledge that harm will result." (quotations marks and citation omitted)).

First, for a defendant to have "actually kn[own] of" the risk, *Young*, 238 F.3d at 576, means just that: that he "actually . . . perceived the risk," *Parrish*, 372 F.3d at 302. At a minimum, this requires that "the official must both [have been] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he must also [have drawn] the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979, 128 L.E.2d 811 (1994). To support a finding of knowledge based on such an inference, "the risk of injury must [have been] so obvious that the fact-finder could conclude that the [officer] *did* know of it because he could not have failed to know of it" absent wilful ignorance. *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). Thus, the Supreme Court has explained that a plaintiff can make a *prima facie* case under this standard by showing "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842, 114 S. Ct. at 1981.

Second, for a defendant to be said to have "disregarded" the risk, *Young*, 238 F.3d at 576, the official must have recognized that his actions were "inappropriate in light of that risk," *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (stating that an official "avoids liability if he responded reasonably to the risk of which he knew"). Here, as with the knowledge requirement, a factfinder may rely on an inference. For instance, "a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that

his response to the risk was inappropriate under the circumstances." *Parrish*, 372 F.3d at 303.

## Discussion

In their motion for summary judgment, the remaining Defendants, all individuals, argue that they were acting within their discretion when they responded to the events surrounding the beating of Plaintiff Denney. Thus, the Court's analysis centers on whether Denney has raised a genuine issue of material fact as to whether the Defendants are protected by qualified immunity.

Working within the qualified immunity framework, the Court will first consider whether Denney has overcome the summary judgment standard by showing that a genuine issue of material fact exists as to whether the individual defendants displayed a deliberate indifference that violated his Fourteenth Amendment rights. The Court first evaluates whether Denney has satisfied the objective prong (serious harm), then the Court weighs whether Denney has proven a genuine issue as to the subjective prong (the culpable state of mind) with respect to each of the individual defendants. After conducting this analysis, which clarifies whether a question of fact exists about whether a specific constitutional violation has been committed, the Court will then complete its qualified immunity analysis by determining whether at the time of the alleged violation the right was clearly established.

Though guidance is limited on the question of what precisely constitutes a sufficiently serious deprivation, the threat of a beating by another inmate clearly satisfies the objective component of this analysis. *Cf. Brown*, 240 F.3d at 389 (holding that "[a] substantial risk of suicide is certainly" sufficient to meet this standard); *Arflack v. Cnty. of Henderson, Ky.*, 412 F. App'x 829, 834 (6th Cir. 2011) (holding that "a threat to the health and safety of another inmate is sufficiently serious to satisfy" this standard (quotation marks and citation omitted)). Since the

Defendants did not object to the Magistrate Judge's finding that Denney has shown a serious deprivation, (Dkt. No. 62 at 12), the Court accepts that finding. *See Diamond*, 416 F.3d at 315. As a result, the Court has little trouble concluding that Denney has met his burden with respect to the objective element of his claim by showing "that he [wa]s being detained or incarcerated under conditions posing a substantial risk of serious harm." *Brown*, 240 F.3d at 389.

The Court next considers whether Denney has met his burden with respect to the subjective element of his deliberate indifference claims, demonstrating "that the defendants actually knew of and disregarded a substantial risk of serious injury" to him. *Young*, 238 F.3d at 575–76. The Court addresses the state of mind of each Defendant in turn, considering each Defendant's level of knowledge as to what risk Denney faced and the actions each Defendant took based on that knowledge.

The Court agrees with the Magistrate Judge that Denney has presented evidence showing that Defendants Private Tucker, Private First Class Wigfall and Sergeant Maybank each possessed the requisite culpable state of mind. Denney has presented evidence that all three Defendants actually knew of the risk faced by this particular inmate. That is because there is evidence that each Defendant received a specific warning about that risk. *See Parrish*, 372 F.3d at 302 (stating that demonstrating knowledge requires showing that the defendant "actually . . . perceived the risk"). Maybank, who initially assigned Denney to Pod C-1, received a phone call from Denney's bail bondsman informing her that, according to Denney's father, Denney was being threatened by other inmates. (Dkt. No. 62 at 4). Tucker also received a direct warning when Denney told Tucker that he was "terrified for [his] life to go back [into the Pod of 50 detainees] because they [were] threatening to beat [him] when the lights go out." After that,

Tucker informed his colleague Wigfall of the risk of a beating as well. (Dkt. No. 62 at 6).

Denney has also presented evidence that these three Defendants disregarded the substantial risk of serious injury to Denney. Sgt. Maybank took no action, other than telling the bondsman that Denney could call the detention center's control tower by intercom from his cell if there were a problem. (Dkt. No. 62 at 4–5). Private Tucker told Denney there was nothing he could do about the threats at that moment, though he did relay Denney's expression of fear to Private First Class Wigfall shortly thereafter. In response to that information, Wigfall instructed Tucker to continue finishing his other assignments and told Tucker that he would check on Denney a bit later. (Dkt No. 62 at 6). Tucker did not act on his knowledge that, as Denney had told him, "later's going to be too late." (Dkt. No. 6 at 6). Nor did Wigfall take any action until after the beating occurred. This lack of action occurred despite the availability of alternative approaches, such as immediately securing Denney in the so-called "bubble" containment area near the observation tower. (Dkt. No. 57-2 at 47). According to the detention center's Inmate Rules, such a transfer can be made "at any time" in the interest of security and personal safety. (Dkt. No. 57-1 at 1). From this evidence, a reasonable factfinder could conclude that the actions taken by these officers were "inappropriate in light of th[e] risk" that they knew Denney faced. *Rich*, 129 F.3d at 340 n.2; *see also Parrish*, 372 F.3d at 303.

In contrast, Denney has not presented evidence showing that Defendant Menzie possessed a culpable state of mind. That is because there is not enough evidence to support a finding that Menzie "actually knew of" the risk of serious injury faced by Denney. *Young*, 238 F.3d at 575–76. The evidence reflects that Menzie was stationed in the detention center's control tower, and was responsible for supervising the Pods, including Pod C-1, which held Denney and

roughly 50 other inmates. (Dkt. No. 58-2 at 12–13). Menzie apparently observed these areas both through video feeds and a direct sight line. (Dkt. No. 58-2 at 13). Denney has presented evidence that the cameras in Pod C-1 were covered with wet toilet paper shortly before and during his beating, and that no action was taken for approximately 20 minutes after the cameras were covered. (Dkt. No. 62 at 6).

Denney claims that, from this period of inaction, a factfinder could infer that Menzie in fact knew of the risk Denney faced. This Court concludes otherwise. Mere negligence is not enough to support a deliberate indifference claim, of course. *See Short*, 436 F.3d at 427. And Denney has not proffered evidence to support the reasonable inference that Menzie's behavior was anything more than negligence. Menzie was not directly informed of a threat to Denney. Nor has it been shown that Menzie was familiar with the practice of covering cameras with wet toilet paper, or that he would have associated that practice with a risk of violence. (*See* Dkt. No. 58-2 at 14). Moreover, it was only during the investigation following Denney's beating that Menzie and the other Defendants learned other beatings had recently occurred. (Dkt. No. 62 at 7). Without more, such as evidence showing that Menzie associated the obstruction of security cameras with a risk of violence, and could not have missed seeing the obstructed camera views, the risk of injury was not "so obvious that the fact-finder could conclude that [Menzie] *did* know of it because he could not have failed to know of it" absent wilful ignorance. *Brice*, 58 F.3d at 105. Put another way, the evidence does not raise a question about whether Menzie "actually . . . perceived the risk" of harm to Denney. *Parrish*, 372 F.3d at 302.

The same holds for Sheriff DeWitt, though the analysis is slightly different because he is a supervisor. It is long-established that government officials may not be held liable for the

unconstitutional conduct of their subordinates under a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L.E.2d 611 (1978). As a result, in order to succeed on a § 1983 suit against a supervisor, a plaintiff must plead that the official himself, "through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 1948, 173 L.E.2d 868 (2009); *see also id.* at 677, 129 S. Ct. at 1949 ("In a § 1983 suit . . . the term 'supervisory liability' is a misnomer."). It is not enough, therefore, for Denney to have shown that Sheriff Dewitt breached a duty to ensure that his subordinates acted within the law. Rather, Denney must have shown that Dewitt, through his own deliberate indifference, violated Denney's Fourteenth Amendment rights.

Nevertheless, supervisors may still be held liable under § 1983. *See, e.g., Taylor v. Lang*, No. 12-6069, 2012 WL 2354460, at *2 (D.S.C. June 21, 2012) (conducting supervisory liability analysis under § 1983 post-*Iqbal*); *Smith v. Ray*, 409 F. App'x 641, 650 (4th Cir. 2011) (same); *see also Starr v. Baca*, 652 F.3d 1202, 1205–07 (9th Cir. 2011) (explaining why *Iqbal* did not affect the existence of supervisory liability under § 1983). That is because the liability of a supervisor is not based on ordinary principles of vicarious liability, but instead on "'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may [itself] be a causative factor in the constitutional injuries [the subordinates] inflict on those committed to their care.'" *Anderson v. Davies*, No. 3:10-cv-2481, 2012 WL 1038663 at *2 (D.S.C. Mar. 28, 2012) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). "Thus, when a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action, not held vicariously liable for the culpable action or inaction of his or her subordinates." *Starr*, 652 F.3d at 1207.

Given that background, it makes sense that the state of mind requirement for a deliberate indifference claim is modified somewhat in the supervisory context, requiring a plaintiff to demonstrate:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff."

*Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quotation marks and citation omitted).

Plaintiff Denney's claim against Dewitt fails because he has not shown that Dewitt "had actual or constructive knowledge that his [subordinates were] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff." *Id*; *see also Young*, 238 F.3d at 576 (requiring that a defendant "actually knew of" the risk to the plaintiff). Denney essentially argues that Dewitt must have known of the risk, given the many alleged lapses in protocol by prison officials. But a deliberate indifference claim requires more than that. In order for the fact-finder to infer that an official knew of the risk, the plaintiff must have shown that the risk "was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842, 114 S. Ct. at 1981. Denney has offered no evidence that Dewitt was aware that his subordinates were placing individuals charged with crimes against minors into cells where they might be the targets of violence, or of any other violations of policy. Nor has Denney shown

that Dewitt knew of the two beatings that occurred at the detention center in the weeks leading up to this incident. Thus, Denney has not raised beyond the level of mere speculation his claim that Dewitt knew his subordinates were engaged in conduct that posed a risk to the safety of individuals in Denney's position.

Last, having concluded that Plaintiff Denney has shown that a genuine issue of material fact exists as to whether Defendants Tucker, Wigfall and Maybank violated his Fourteenth Amendment rights, the Court must determine whether at the time of the alleged violation the right was clearly established. Specifically, the question is whether the law was so well established by September 29, 2008 that reasonable prison officials should have recognized the unconstitutionality of declining to take measures promptly to secure the safety of a prisoner who brings to their attention his cellmates' threats to his immediate personal safety. This is a close question, given the imperative for prompt action presented by the circumstances of this case. Nevertheless, the Court concludes that by 2008 it was clearly established that immediate action, or something approaching it, was required of prison officials who knew of an imminent, serious threat to the physical safety of a pretrial detainee.

At least as early as 1992, "it was clear that as a component of their duty to provide inmates with humane conditions of confinement, prison officials were required to 'take reasonable measures to guarantee the safety of inmates.'" *Rish v. Johnson*, 131 F.3d 1092, 1096–97 (4th Cir. 1997) (quoting *Farmer*, 511 U.S. at 832, 114 S. Ct. at 1976 (citation omitted)). Moreover, the Supreme Court has consistently "assumed" that this responsibility included "a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833, 114 S. Ct. at 1976 (citation omitted); *see also De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th

Cir. 2003) (holding that, as alleged, prison officials' denial of treatment for an inmate's compulsion to self-mutilate constitutes deliberate indifference violating the Eighth Amendment).

The contours of this Eighth Amendment obligation will, however, vary depending on the circumstances at hand. "Deliberate indifference that shocks in one environment may not be so patently egregious in another." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850, 118 S. Ct. 1708, 1719, 140 L.E.2d 1043 (1998). As the Supreme Court has explained, "in the custodial situation of a prison, forethought about an inmate's welfare is . . . obligatory." *Id.* at 851, 118 S. Ct. at 1719. However, that obligation of forethought "rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* at 853, 118 S. Ct. at 1720. Due to the need for quick action under the facts of this case, such a "luxury" was not wholly present. *Id.*, 118 S. Ct. at 1720. And of course, this Court affords prison officials "discretion to determine what is necessary for the prison's internal security." *Williams v. Benjamin*, 77 F.3d 756, 765 (4th Cir. 1996) (citation and quotation marks omitted).

Nevertheless, this Court concludes that it violated a "clearly established . . . constitutional right[] of which a reasonable person would have known," *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738, for a prison official presented with an immediate, serious threat to a prisoner's safety, and capable of taking effective action safely, to disregard that risk completely, as Maybank is alleged to have done, or to postpone action for the sake of timely serving a meal, as Tucker and Wigfall are alleged to have done. Such a basic obligation would have been readily "apparent" under the law existing at the time. *Anderson*, 483 U.S. at 640, 107 S. Ct. at 3039; *see Lanier*, 520 U.S. at 271, 117 S. Ct. at 1227.

## Conclusion

After review of the record, the R&R, Defendants' Objections and Plaintiff's Response to those Objections, and the applicable law, this Court adopts as the Order of this Court the Magistrate Judge's recommendations: (1) to dismiss Defendants Thompson and Berkeley County from this action; (2) to deny Plaintiff's request for injunctive relief; (3) to grant summary judgment for the Defendants as to Plaintiff's conspiracy claim under 42 U.S.C. § 1985; and (4) to preclude suit for monetary damages against Sheriff DeWitt, in his official capacity, under the Eleventh Amendment. For the reasons stated above, the Court agrees with the Magistrate Judge that summary judgment should be DENIED as to Defendants Tucker, Wigfall and Maybank, but concludes that summary judgment should be GRANTED to Defendants Menzie and DeWitt, in his individual capacity.

AND IT IS SO ORDERED.

Richard Mark Gergel
United States District Court Judge

September 4, 2012
Charleston, South Carolina